[Cite as *State v. Krupp*, 2025-Ohio-5162.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
DARKE COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | C.A. No. 2025-CA-6 |
| Appellee | : | |
| | : | Trial Court Case No. 24-CRB-001-0450 |
| v. | : | |
| | : | (Criminal Appeal from Municipal Court) |
| JOHNATHON M. KRUPP | : | |
| | : | **FINAL JUDGMENT ENTRY &** |
| Appellant | : | **OPINION** |
| | : | |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on November 14, 2025, the judgment of the trial court is reversed and remanded for further proceedings consistent with the opinion.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.


For the court,


RONALD C. LEWIS, JUDGE

HUFFMAN, J., and HANSEMAN, J., concur.

OPINION

RANDALL E. BREADEN, Attorney for Appellant
JOSHUA M. KUNKEL, Attorney for Appellee

LEWIS, J.

{¶ 1} Defendant-Appellant Johnathon M. Krupp appeals from a judgment of the Darke County Municipal Court finding him guilty of one count of domestic violence following a bench trial. For the following reasons, the judgment of the trial court is reversed.

## I. Procedural History and Facts

{¶ 2} On November 15, 2024, a complaint was filed charging Krupp with one count of domestic violence in violation of R.C. 2919.25(A), a misdemeanor of the first degree. Krupp entered a not guilty plea and the case proceeded to a bench trial. The following testimony was adduced at trial.

{¶ 3} T.K., Krupp's ex-wife, testified that she and Krupp were married for ten years and had two children together. The couple divorced in April 2023. Custody of the children was exchanged on a "week on, week off" basis. On Friday, November 8, 2024, the parents met at the Dollar General in Arcanum, Ohio, to exchange their children. At that time, their daughter "Isabel" was 5 years old, and their son "Jacob" was 11 years old.[1]

{¶ 4} When T.K. arrived with the children for the exchange, she was running late and pulled up next to Krupp's van, one parking space apart. The passenger side of T.K.'s vehicle was next to the driver's side of Krupp's van. T.K. was driving her 2001 Toyota Corolla with her mother "Lisa" and Lisa's dog in the front seat, Jacob in the back passenger-

---

[1] To improve readability and protect the privacy of the minor children and the victim, we use pseudonyms to refer to the children and the victim's mother.

side seat, and Isabel in the back driver's-side seat. Jacob got out of T.K.'s car and into the front passenger seat of Krupp's van. Isabel did not want to go with Krupp and started crying. She got on the floor in the back of T.K.'s car and refused to leave. Krupp initially told T.K. to keep their daughter, but T.K. refused because it was "a Court-ordered document that [they] need to uphold [their] normal custody agreements." Trial Tr. 16 ("Tr."). Krupp tried to get Isabel out of T.K.'s car from the rear passenger side, but Isabel exited the driver's side and T.K. picked her up. T.K. then took Isabel over to Krupp's van and placed her in a booster seat in the rear driver's side of the vehicle. The van had a sliding rear door on both sides of the vehicle. T.K. did not buckle Isabel into the seat.

{¶ 5} Once Isabel was in the booster seat, she tried to jump out of the car and get to T.K. Krupp attempted to put Isabel's seat belt on, but she was throwing a tantrum and trying to get out of the van. Krupp held her down to prevent her from leaving the van. According to T.K., Krupp's left hand "was directly across [Isabel's] right shoulder, thumb was across her collar bone with his fingers pressed on the back part of her shoulder" holding her in the booster seat. Tr. 28. T.K. heard Isabel say "ow, Daddy, that hurts." Tr. 20. T.K. tried to grab Krupp's right arm to "pull him away" and tell him that he needed to let go of Isabel, but he shrugged her off. Tr. 15. T.K. was standing directly next to Krupp on his right-hand side because she was "grabbing onto his arm to try to get him off of [their] daughter." Tr. 29. T.K. then grabbed Krupp's arm or shoulder again to get Krupp off Isabel "because he was holding her down, to which he turned around and shoved [T.K.] into [her] car." Tr. 9. T.K. stated that when Krupp shoved her against the passenger side of her car, she took two steps back into the parking space. Her head hit the top of her vehicle, her left shoulder hit the mirror, and her ankle hit the bottom of the car. She did not fall to the ground because the

3

car blocked her from falling. There were no injuries to her back, but there were injuries to her leg.

{¶ 6} Krupp then closed the driver's-side sliding door of the van, got into the vehicle, and tried to back out of the parking space. Isabel, who was not yet buckled in her seat, jumped out of the passenger side of the van and ran to T.K. Krupp left the scene, and T.K.'s mother called the police.

{¶ 7} T.K. took Isabel to Dayton Children's to get examined. T.K. then went to Miami Valley North to get medical treatment for herself. T.K. had x-rays and CT scans taken of her head and shoulder, which turned out negative. Although the hospital did not take pictures of T.K.'s injuries, T.K. took photographs of her leg over the course of the following week, which showed swelling and bruising on her right leg.

{¶ 8} T.K.'s mother, Lisa, testified that she was at the custody exchange on November 8, 2024. Before arriving at the parking lot, her granddaughter Isabel started crying. When T.K. parked the car, the car and van were facing the same direction, parallel to one another. There was not a parking space between the vehicles. They were about three feet apart.

{¶ 9} Lisa's grandson Jacob got out of the car and into Krupp's van, but Isabel was on the back floor of the vehicle crying and refused to get out. Lisa took her dog outside the car to go to the bathroom. Lisa then saw Krupp unsuccessfully try to get Isabel out of the car. Lisa heard Krupp tell Isabel that he would throw away all her birthday presents and not have a birthday party. Krupp offered for T.K. to keep Isabel, but T.K. said she had to work.

{¶ 10} T.K. was eventually able to get Isabel out of her vehicle, despite the child crying and saying that she did not want to go with Krupp. T.K. then took Isabel to Krupp's

4

van and put her in the booster seat. Krupp held Isabel with his left hand to try to keep her in the booster seat. Lisa was unable to see what happened at that point because she was in front of the vehicles with her dog, but she could hear her granddaughter crying. Lisa put her dog back into T.K.'s vehicle and closed the rear passenger door. Lisa heard her granddaughter crying and say "no, Daddy, that hurts, don't do that, no, please, I want my mommy." Tr. 47. Lisa then heard T.K. say "John, you are hurting her, let her go." *Id*.

{¶ 11} Once Lisa had turned around after putting her dog into T.K.'s car, she was standing on Krupp's right side, and T.K. was standing on the left side of Krupp. Lisa saw T.K. attempt to reach into the van to get Isabel out, who was struggling to leave the booster seat. According to Lisa, Krupp turned around, grabbed T.K.'s chest, and "threw her" into T.K.'s car. Lisa later clarified in her testimony that Krupp had not actually picked up T.K. and thrown her but rather had pushed her with his hand. Lisa did not see T.K. grab Krupp, but she did see Krupp turn around and shove T.K. in the upper chest. Lisa saw T.K. hit her head on the car's mirror and crumple to the ground. Lisa went to T.K. and tried to help her up. Meanwhile, Krupp slammed the van door shut. Isabel then opened the passenger-side sliding door and got out of the van. T.K. ran over to Isabel behind the van and pulled her over to the side. Lisa did not recall whether Krupp's van had moved before T.K. grabbed Isabel after she had fled out the passenger side of the van. Lisa grabbed her phone to call the police and asked where Krupp was going. He told her to call the police and tell them to go to his house, and Lisa called the police.

{¶ 12} After the police responded to the Dollar General, Lisa and T.K. took Isabel to Dayton Children's because she had a mark on her chest. T.K. went to the hospital afterward with her roommate. T.K. had an injury to her ankle and had trouble walking.

5

{¶ 13} John Schweser, an Arcanum Police Officer for six months, testified that he responded to the Dollar General on November 8, 2024. When Schweser arrived, he and his training officer met with Lisa and T.K., who appeared shaken up. The five-year-old daughter was crying and scared. Schweser first spoke with Lisa and then with T.K. before speaking with Isabel.

{¶ 14} T.K. had red marks on her chest and complained of ankle pain and head pain. T.K. had bruising on her ankle, and there were red marks on the right shoulder area of her chest. Schweser did not observe any marks on the five-year-old but was later told there was bruising. He offered for Arcanum EMS to come, but T.K. refused. T.K. admitted that she grabbed Krupp's arm before he pushed her, and she might have snagged his hoodie during the incident.

{¶ 15} After taking photographs and getting statements, Officer Schweser contacted Krupp to get his statement. Krupp voluntarily came to the police station with Jacob a few hours after the incident. Both Krupp and Jacob provided statements to the police. Krupp told Schweser that he was acting in self-defense because T.K. had grabbed his hoodie to the point it was almost strangling him. Schweser observed a little redness on the front and back of Krupp's neck. Schweser testified that Krupp was much larger than T.K. Schweser verified that there was no surveillance video available from the Dollar General, and he did not personally observe the incident.

{¶ 16} Jacob testified that his mother, T.K., drove to Dollar General on November 8, 2024, where he got out of her car and into the front passenger side of his father's van. His sister, Isabel, started crying when they arrived at Dollar General.

{¶ 17} At that time, Jacob was in the front passenger seat with his seat belt on, and he turned around to see the back seat of the van. He saw Krupp putting Isabel into the "car

6

seat," but she was crying and did not want to go with Krupp. She was upset and "kind of" throwing a temper tantrum. Jacob saw T.K. grab the back of Krupp's hood and then Krupp spun around. After Krupp spun around, T.K. grabbed the bottom of Krupp's hand, and Krupp pushed her off. Jacob saw T.K. back up into her car, but he did not see her fall to the ground. Isabel then got out of her seat and ran to the other side of the van, opened the door, and ran to T.K. The van was not moving when Isabel got out. Krupp then left with Jacob.

{¶ 18} At trial, Jacob denied that anyone told him what to say in court and testified that he told the officer the same information he gave in court. Jacob indicated that he had never testified before and told the court he was a "little" scared.

{¶ 19} Krupp testified that on November 8, 2024, he drove his 2019 Honda Odyssey to the Dollar General for a custody exchange with his ex-wife. He arrived early and had Isabel's birthday balloons in the van. T.K. pulled up next to the driver's side of Krupp's van. There was no parking space between the vehicles, which were parked about three feet apart.

{¶ 20} Lisa got out of the front passenger's seat, and Jacob got out of the rear passenger-side seat. Jacob went directly to Krupp's van and got into the front passenger's seat. Isabel started crying and said that she did not want to go with Krupp. Isabel stayed in the back seat of T.K.'s car throwing a fit for about 5-10 minutes, so Krupp told T.K. that she could keep their daughter since she did not want to come with him. T.K. said she could not take their daughter because she had to work.

{¶ 21} Both parents tried to get Isabel out of T.K.'s car, who was throwing a tantrum and curled up on the floor of the back seat. Krupp told Isabel that if she did not want to come, then he would have to throw away the balloons and birthday cake. T.K. asked for

7

Krupp's help to get Isabel out of the car, so he opened the back passenger door to get her out. Isabel then got out on the driver's side where T.K. was, and T.K. carried her to Krupp's van. T.K. put Isabel in a booster seat in the rear driver's side of the van but did not buckle her in.

{¶ 22} After T.K. gave Isabel a hug and went to leave, Isabel tried to jump out of the booster seat. Krupp put his hand on Isabel's belly near the sternum to prevent her from getting out of the booster seat. Krupp used his left hand to hold Isabel and used his right hand to point and wag his finger at Isabel to tell her "that's enough." Tr. 113. T.K. was standing behind Krupp, on his right side. Krupp, who was bending down into the vehicle, was then yanked up by the back of his hoodie, and T.K. screamed at him that he was hurting their daughter. Krupp turned around to tell T.K. not to touch him and put his hands up. T.K. grabbed both his wrists, and he pushed her away using both hands, palms facing out, on the outside of her shoulders. Krupp denied that he tried to harm T.K. He said that he wanted her to get away from him and create some distance because she had pulled on him. T.K. fell back against her car but did not fall to the ground.

{¶ 23} After Krupp pushed T.K., he pressed the button to close the rear driver's-side sliding door of the van and got into the driver's seat. He intended to drive across the street to get away from the situation at which point he planned to buckle in Isabel. As soon as Krupp got in the van, Isabel hit the button for the rear passenger's-side sliding door to open, and she hopped out of the van and ran to T.K. Krupp's van was not in motion when Isabel got out of the van.

{¶ 24} Both T.K. and Lisa yelled at Krupp that they were going to call the police because he assaulted T.K. He told them to send the police to his house because he was not going to stay since he did not feel safe. Krupp drove home and waited for the police.

8

When Officer Schweser called him, he drove to the police station with Jacob where they both gave statements similar to what they testified to at trial.

{¶ 25} Officer Schweser was recalled for rebuttal testimony. He stated that he did not observe any marks on Krupp's wrists on the night of the incident. Schweser noted that Krupp was wearing a hoodie at the time and there were probably no marks on Krupp's wrists because he was wearing a hoodie.

{¶ 26} At the conclusion of trial, the trial court found Krupp guilty as charged and ordered a pre-sentence investigation report for sentencing. On March 10, 2025, Krupp was ordered to serve a one-year term of probation with no violations of the law. He was sentenced to serve 89 days in jail with 86 days suspended. Krupp was given the option to complete an online anger management class or, in the alternative, to serve the remaining three days in jail. He was ordered to report to Regain Better Help counseling, comply with any recommendations, and sign a release of information. Krupp was further ordered to comply with a civil protection order. Finally, Krupp was ordered to pay a $150 fine, $500 restitution, and court costs.

{¶ 27} Krupp timely appealed.

## II. Sufficiency of the Evidence

{¶ 28} We consider Krupp's second assignment of error first, which states:

THE DEFENDANT/APPELLANT'S CONVICTION WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE.

{¶ 29} "A claim challenging the sufficiency of the evidence invokes a due-process concern and raises the question whether the evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Clinton*, 2017-Ohio-9423, ¶ 165, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). "The relevant inquiry is whether, after viewing

9

the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus.

{¶ 30} Krupp was found guilty of domestic violence, which provides that "[n]o person shall knowingly cause or attempt to cause physical harm to a family or household member." R.C. 2919.25(A). Krupp does not claim that there was insufficient evidence to support every element of the offense of domestic violence. Rather, Krupp contends that his conviction is not supported by sufficient evidence because he satisfied his burden of establishing self-defense.

{¶ 31} When an accused asserts self-defense, he or she does not seek to negate any of the elements of the offense that the State is required to prove. *State v. Martin*, 21 Ohio St.3d 91, 94 (1986). Rather, it is an admission to having committed the prohibited conduct coupled with a claim that the surrounding facts or circumstances exempt the accused from criminal liability. *State v. Poole*, 33 Ohio St.2d 18, 19 (1973). Self-defense is an affirmative defense, but an affirmative defense is not an element of a crime. *State v. Messenger*, 2022-Ohio-4562, ¶ 24, citing *State v. Hancock*, 2006-Ohio-160, ¶ 35. Whether the State presented sufficient evidence does not implicate affirmative defenses because proof supportive of an affirmative defense does not detract from the proof beyond a reasonable doubt that the defendant had committed all the substantive elements of the offense. *Hancock* at ¶ 37-38. The State's burden of disproving the defendant's self-defense claim beyond a reasonable doubt is therefore subject to a manifest-weight review on appeal rather than a sufficiency of the evidence review. *Messenger* at ¶ 27.

{¶ 32} Krupp's second assignment of error is overruled.

10

### III. Manifest Weight

{¶ 33} Krupp's first and third assignments of error are interrelated, so we consider them together.   The first and third assignments of error state, respectively:

> THE DEFENDANT/APPELLANT'S CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

> THE TRIAL COURT ERRED IN FINDING THAT HIS SELF-DEFENSE CLAIM FAILED.

{¶ 34} These two assignments of error contend that Krupp's conviction is against the manifest weight of the evidence because he acted in self-defense and the State failed to disprove beyond a reasonable doubt that he acted in self-defense.   Pursuant to R.C. 2901.05, the State's burden of disproving the defendant's self-defense claim beyond a reasonable doubt is subject to a manifest-weight review on appeal.  *Messenger*, 2022-Ohio-4562, at ¶ 27.

{¶ 35} "A weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive."   *State v. Wilson*, 2009-Ohio-525, ¶ 12 (2d Dist.), citing *State v. Hufnagle,* 1996 WL 501470 (2d Dist. Sept. 6, 1996).   When a conviction is challenged on appeal as being against the weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'"   *Thompkins*, 78 Ohio St.3d at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).   A judgment should be reversed as being against the

11

manifest weight of the evidence "only in the exceptional case in which the evidence weighs heavily against the conviction." *Martin* at 175.

{¶ 36} Under Ohio law, a person is permitted to act in self-defense. R.C. 2901.05(B)(1). R.C. 2901.05(B)(1) states, in relevant part:

> If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, . . . the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense . . . .

{¶ 37} Accordingly, the initial burden of producing evidence "that tends to support" a self-defense claim is on the defendant. *State v. Bowen*, 2024-Ohio-1079, ¶ 11 (2d Dist.). "'[I]f the defendant's evidence and any reasonable inferences about that evidence would allow a rational trier of fact to find all the elements of a self-defense claim when viewed in the light most favorable to the defendant, then the defendant has satisfied the burden.'" *State v. Palmer*, 2024-Ohio-539, ¶ 20, quoting *Messenger*, 2022-Ohio-4562, at ¶ 25. "[T]he defendant's burden of production is not a heavy one and . . . might even be satisfied through the state's own evidence." *Messenger* at ¶ 22. Once the defendant puts forth sufficient evidence that he or she was acting in self-defense, the burden then shifts to the State to prove beyond a reasonable doubt that the defendant did not act in self-defense. *Bowen* at ¶ 12, citing *Messenger* at ¶ 19.

{¶ 38} To establish self-defense in the case of non-deadly force, the defendant must show that he or she: (1) was not at fault in creating the situation giving rise to the altercation; (2) had reasonable grounds to believe and an honest belief, even if mistaken, that the defendant was in imminent danger of bodily harm; and (3) the only means of protecting

12

himself or herself from that danger was by the use of force not likely to cause death or great bodily harm. *State v. Rhoades*, 2025-Ohio-2358, ¶ 15 (2d Dist.), citing *State v. Coleman*, 2018-Ohio-1951, ¶ 13 (2d Dist.). "Because each element must exist for a self-defense claim to prevail, the state can defeat a self-defense claim by disproving any one of these elements beyond a reasonable doubt." *State v. Knuff*, 2024-Ohio-902, ¶ 191. Additionally, there is no duty to retreat in cases involving non-deadly force. *State v. Fritz*, 2005-Ohio-4736, ¶ 20 (2d Dist.), citing *State v. Marbury*, 2004-Ohio-1817, ¶ 22 (2d Dist.).

{¶ 39} In this case, both parties focus on the first element, whether the defendant was at fault in creating the situation giving rise to the altercation in which the force was used. "The 'not at fault' requirement also means that the defendant must not have been the first aggressor in the incident." *State v. Turner*, 2007-Ohio-1346, ¶ 23 (2d Dist.), citing *State v. Robbins*, 58 Ohio St.2d 74 (1979). The State contends that Krupp was at fault in creating the situation giving rise to the affray in which the force was used because he was harming his daughter. Krupp, on the other hand, contends that T.K. was at fault in creating the situation giving rise to the affray because she used force against him first.

{¶ 40} While cases involving self-defense generally implicate competing versions of events, that is not the case here. Rather, according to the testimony of the witnesses, there is no great discrepancy in the sequence of events. The parties do not dispute that T.K. and Krupp's five-year-old daughter was acting up and did not want to go with Krupp for his parenting time. The witnesses confirmed that Krupp was trying to hold Isabel in her booster seat with his left hand because she was trying to get out of the seat. Isabel was required by law to be properly secured in the booster seat before she could be transported in the van. T.K., Krupp, and their son, testified that T.K. used physical force on Krupp before he used

13

any force against her. Officer Schweser also testified that T.K. had admitted to him that she grabbed Krupp's arm prior to him pushing her away.

{¶ 41} The State contends that because Krupp was causing physical harm to Isabel before T.K. used force on him, he was the initial aggressor. We do not agree.

{¶ 42} Even if the trial court found T.K.'s testimony entirely credible, the State did not prove beyond a reasonable doubt that Krupp was the initial aggressor. T.K. stated that once she put Isabel in the booster seat in Krupp's van, Isabel tried to jump out of the van and get to T.K. Krupp held Isabel down with one hand to prevent her from leaving the van because he was trying to put her seat belt on. T.K. heard Isabel say "ow, Daddy, that hurts," so T.K. grabbed Krupp's right arm to "pull him away" and tell him to let go of their daughter. Because Krupp was able to shrug T.K. off, she grabbed Krupp's arm or shoulder a second time, which is when Krupp turned around and shoved her. T.K. informed Officer Schweser that she may have snagged Krupp's hoodie during the incident.

{¶ 43} There is no dispute that Isabel had a tantrum, refused to stay in her booster seat, and tried to jump out of the Krupp's van instead of being buckled in properly. Krupp, as Isabel's parent during his parenting time, was permitted to use reasonable measures to hold her in the booster seat to be appropriately restrained with a seat belt. Krupp reasonably restrained his child in her booster seat for her safety, so he was not the initial aggressor against T.K. Therefore, the State failed to meet its burden of disproving beyond a reasonable doubt that Krupp was not at fault in creating the situation giving rise to the altercation between T.K. and Krupp.

{¶ 44} Although the parties focus only on this first element, we must affirm the trial court's judgment if the record establishes the State disproved either of the other two elements of self-defense beyond a reasonable doubt. Having reviewed the entirety of the

14

evidence presented at trial, we cannot conclude that the State met its burden to establish beyond a reasonable doubt that Krupp did not act in self-defense regarding the remaining two elements of self-defense.

{¶ 45} Krupp had objectively reasonable grounds to believe and an honest belief, even if mistaken, that some force was necessary to defend himself against the imminent use of unlawful force. "Force" is statutorily defined as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1). Again accepting T.K.'s testimony as entirely credible, T.K. stated that she grabbed onto Krupp and attempted to pull him away from their daughter. Although T.K. claimed that Krupp was able to brush her off the first time, T.K. grabbed onto Krupp's arm or shoulder a second time, which resulted in him pushing her away. Officer Schweser testified that T.K. admitted that she had grabbed Krupp's arm before he pushed her and she might have snagged Krupp's hoodie during the incident. At the time Krupp shoved T.K. away from him, T.K. had already used force on him and was using unlawful force against him a second time.

{¶ 46} Moreover, without minimizing the injury sustained by T.K., there is no legal dispute that Krupp's actions were not likely to cause death or great bodily harm to T.K. Furthermore, the evidence presented did not establish beyond a reasonable doubt that the amount of force Krupp used to repel T.K. was a greater degree of force than was necessary under the circumstances.

{¶ 47} Having carefully reviewed the entirety of the evidence presented at trial, we conclude that the trier of fact lost its way and created a manifest miscarriage of justice in finding Krupp guilty of domestic violence. Accordingly, we sustain his first and third assignments of error.

15

**{¶ 48}** Where a conviction is found to be against the manifest weight of the evidence, the remedy is a new trial. *State v. Fips*, 2020-Ohio-1449, ¶ 10. We therefore reverse Krupp's conviction and remand for a new trial.

### IV.     Conclusion

**{¶ 49}** Having sustained Krupp's first and third assignments of error, we reverse his conviction and remand the case to the trial court for further proceedings.

. . . . . . . . . . . . .

HUFFMAN, J., and HANSEMAN, J., concur.