[Cite as *State v. Wa Tenza*, 2026-Ohio-145.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | C.A. No. 2025-CA-7 |
| Appellee | : | |
| | : | Trial Court Case No. 24 CRB 00511 |
| v. | : | |
| | : | (Criminal Appeal from Municipal Court) |
| SANYU KIRIBAKA PIANKHI WA | : | |
| TENZA | : | **FINAL JUDGMENT ENTRY &** |
| | : | **OPINION** |
| Appellant | : | |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on January 16, 2026, the judgment of the trial court is affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

_____
ROBERT G. HANSEMAN, JUDGE

TUCKER, J., and HUFFMAN, J., concur.

COLIN P. COCHRAN, Attorney for Appellant
DANIELLE E. SOLLARS, Attorney for Appellee

HANSEMAN, J.

{¶ 1} Sanyu Wa-Tenza[1] appeals from his conviction for assault, which followed a jury trial in the Xenia Municipal Court. He claims that his conviction was against the manifest weight of the evidence because the State failed to disprove that he had acted in self-defense. For the following reasons, the trial court's judgment is affirmed.

## I. Facts and Procedural History

{¶ 2} Wa-Tenza and J.W. were in a romantic relationship for approximately three and a half years. By the end, the relationship had become contentious, and the two frequently argued over Wa-Tenza's contacts with a former girlfriend with whom he had a child. The arguments sometimes became physical. Wa-Tenza frequently recorded their interactions with a digital camcorder, and J.W. acknowledged at trial that there were past recordings of her being violent with him.

{¶ 3} In the early morning hours of May 8, 2024, while the two were preparing to watch a movie at J.W.'s apartment, another argument erupted after Wa-Tenza received text messages from his ex-girlfriend. During a heated moment, J.W. reached for Wa-Tenza's camcorder, which had been placed on the arm of the couch. It broke upon falling to the floor.

---

1. The trial court's caption used "Wa Tenza" as the spelling of the appellant's surname, and we have done so as well. *See* App.R. 3(D) (requiring that in the notice of appeal, "[t]he title of the case shall be the same as in the trial court"). However, in this opinion, we use "Wa-Tenza," as that is how he orally spelled his name at trial. Trial Tr. 131-132.

{¶ 4} Wa-Tenza's and J.W.'s testimonies differed as to whether J.W. caused the camcorder to break and in their descriptions of the physical altercation that followed. According to J.W., Wa-Tenza lunged at her as she reached for the camcorder, pushed her to the couch, and got on top of her. He also took her cell phone, threw cat litter at her, punched holes in her wall, and choked her. Wa-Tenza asserted that J.W. had attacked him and tried to prevent him from leaving. Ultimately, J.W.'s eight-year-old daughter ran outside to seek help for her mother, Wa-Tenza drove off, and J.W. and her neighbor both called the police.

{¶ 5} Shortly after 1:00 a.m., several Xenia police officers were dispatched to J.W.'s residence on a report of a domestic violence incident. Upon arrival, Officer Josh Rothenberger obtained the neighbor's contact information and spoke with J.W. Officer Cory Farrar collected J.W.'s written statement and took photographs of the inside of the home and of J.W.'s injuries. Officer Everett Harding talked with J.W.'s daughter.

{¶ 6} Afterward, Officer Rothenberger issued a BOLO ("be on the lookout") for Wa-Tenza, who was found and stopped on State Route 35 by an Ohio State Highway Patrol trooper. Officer Harding drove from J.W.'s home to Wa-Tenza's location and arrested him. Officers Rothenberger and Farrar went to the Xenia police station, where they both had contact with Wa-Tenza. All three Xenia officers noticed scratches on Wa-Tenza's right hand; Officer Farrar photographed them.

{¶ 7} Wa-Tenza was charged by complaint with assault and domestic violence, both first-degree misdemeanors. He pled not guilty to the charges and later filed a notice that he intended to raise self-defense at trial.

{¶ 8} The matter proceeded to a jury trial on December 12, 2024. The State presented six witnesses: the three Xenia police officers; J.W.'s neighbor Laura; J.W.'s daughter, K.W.;

3

and J.W. It also offered several exhibits, including excerpts of two body camera videos, photos of J.W. and her home, and a recording of J.W.'s 911 call. Wa-Tenza testified on his own behalf and presented a nine-minute video of the May 8 argument, which ended when his camcorder broke. He denied engaging in most of the conduct that J.W. had described and further claimed that he had acted in self-defense. After considering the evidence, the jury found Wa-Tenza guilty of both charged offenses.

{¶ 9} Wa-Tenza filed a motion to set aside the verdict. With respect to the domestic violence charge, he claimed that the State had failed to prove that he was a family or household member. As to the assault charge, Wa-Tenza asserted that the State had failed to disprove that he had acted in self-defense. In its response, the State agreed that the guilty verdict for domestic violence should be set aside, but it asked the court to proceed with sentencing on the assault charge.

{¶ 10} The sentencing hearing was held on January 28, 2025. After confirming that the parties had agreed to proceed on the assault charge only, the trial court imposed 180 days in jail with 120 days suspended and credit for 8 days served. Wa-Tenza was placed on two years of community control and ordered to pay a $250 fine plus court costs. The court set aside the domestic violence verdict.

{¶ 11} Wa-Tenza appeals from his conviction, raising a single assignment of error.

## II. Manifest Weight of the Evidence: Self-Defense

{¶ 12} In his assignment of error, Wa-Tenza asserts that his conviction for assault was against the manifest weight of the evidence because the State failed to disprove his claim of self-defense. We disagree.

### A. Relevant Legal Standards

{¶ 13} A person is permitted to act in self-defense. R.C. 2901.05(B)(1); *State v.*

4

*Krupp*, 2025-Ohio-5162, ¶ 36 (2d Dist.). To warrant an instruction on self-defense involving non-deadly force, there must be evidence that (1) the defendant was not at fault in creating the situation giving rise to the altercation; (2) the defendant had reasonable grounds to believe and an honest belief, even if mistaken, that he or she was in imminent danger of bodily harm; and (3) the only means of protecting himself or herself from that danger was by the use of force not likely to cause death or great bodily harm. *State v. Rhoades*, 2025-Ohio-2358, ¶ 15 (2d Dist.). A person does not have a duty to retreat before using force in self-defense "if that person is in a place in which the person lawfully has a right to be." R.C. 2901.09(B).

{¶ 14} If the defendant puts forth evidence that he or she acted in self-defense, the prosecution must prove beyond a reasonable doubt that the accused did not use force in self-defense. R.C. 2901.05(B)(1). The State may prevail by disproving any element of the self-defense claim. *State v. Knuff*, 2024-Ohio-902, ¶ 191.

{¶ 15} The State's burden of disproving a defendant's self-defense claim beyond a reasonable doubt is subject to manifest weight review on appeal. *State v. Messenger*, 2022-Ohio-4562, ¶ 27. "A weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive." *State v. Wilson*, 2009-Ohio-525, ¶ 12 (2d Dist.). When evaluating whether a conviction was against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983).

5

A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

**B. Evidence at Trial**

{¶ 16} At trial, J.W. and Wa-Tenza agreed that Wa-Tenza was at J.W.'s residence on May 8, 2024, that they had intended to watch a movie, and that they began to argue over Wa-Tenza's communications with his ex-girlfriend. They both also testified that there were no holes in the wall prior to the incident. In most other respects, their versions of the subsequent altercation diverged.

{¶ 17} J.W. testified that she had reached for Wa-Tenza's camcorder to give it to him so he could leave. Before she touched it, however, Wa-Tenza lunged at her and pushed her onto the couch, and the two tussled as J.W. tried to get Wa-Tenza off of her. Wa-Tenza believed that J.W. had broken his camcorder, and they argued about that. J.W. stated that Wa-Tenza pushed her onto the couch again, grabbed her feet to yank her to the floor, and then got on top of her, screaming that he was going to "f*ck [her] up." After they "somehow got off of the floor," J.W. went to the front door, opened it, and asked Wa-Tenza to leave. Instead of complying, he shut the door, grabbed J.W. by the throat and pushed her against some shelving. J.W. grabbed Wa-Tenza's shirt to protect herself.

{¶ 18} J.W. further relayed that after the "scuffle" ended, Wa-Tenza took her phone and put it in his pocket, telling her that he was keeping it until she paid for his camcorder. When Wa-Tenza started to leave with her phone, she followed him outside and screamed for a neighbor to call the police. Wa-Tenza told her to go back inside or he would "f*ck her sh*t up." After they both went back inside, Wa-Tenza punched two holes in her living room wall. J.W. followed Wa-Tenza around her home, demanding that he return her phone. When Wa-Tenza walked into the kitchen, he threw cat litter at her.

{¶ 19} After J.W. heard her daughter yelling, "Mommy, I'm scared," J.W. told her daughter to ask a neighbor for help. Wa-Tenza then went outside and headed to his car. Because he still had her phone, J.W. followed him and got into the driver's seat of his car. Wa-Tenza ordered her to get out, but J.W. replied that she needed her phone. After Wa-Tenza threw the phone out the window, J.W. exited the vehicle. Wa-Tenza then drove off, saying that he would "smoke [her] ass" if she called the police. J.W. testified that the encounter left her with bruises on her arms, legs, and back.

{¶ 20} J.W.'s daughter, K.W., was asleep upstairs when the argument began. She testified that she heard a big bang, woke up, and yelled for her mother. When J.W. realized she was awake, J.W. started screaming for K.W. to call the police. K.W. attempted to do so, but her phone would not work. J.W. then called for K.W. to go to a neighbor. K.W. went to the stairs and saw Wa-Tenza choking her mother. When she came down, her mother was standing near the door, trying to keep Wa-Tenza there for when the police arrived. J.W. opened the door for her daughter, and K.W. sought assistance from neighbors. One neighbor heard K.W. crying, came out, and accompanied K.W. back home while calling the police. K.W. was with her mother as J.W. spoke with the officers, but K.W. testified that she was worried and could not hear what her mother was saying. K.W. told the jury that she had not talked with her mother about what happened.

{¶ 21} The neighbor, Laura, testified that she heard a child outside, frantically yelling "can someone help my mommy, my mommy needs help." She came outside and found K.W. running around in the rain, visibly sobbing, very upset, and unsure of what to do. Laura asked K.W. if she (Laura) needed to call the police, and K.W. responded, "yes." Laura testified that she contacted the police as she walked K.W. to her home.

{¶ 22} The responding Xenia officers and Laura provided descriptions of the interior J.W.'s residence. They saw cat litter on the floor, items that appeared to have been thrown about, and two holes in a living room wall. Officer Farrar took photos of the cat litter and the damaged wall.

{¶ 23} Officer Farrar also photographed J.W.'s injuries. The officer testified that J.W. had bruising around her left elbow, red marks up and down the inside of her left arm, red marks around the edge of her neck and the side of her face, redness under her ear, a pronounced bruise on the back of her arm, and bruises along the right side of her back.

{¶ 24} Testifying in his own defense, Wa-Tenza highlighted that J.W. had been violent toward him in the past. He indicated that she had scratched his face, put him in a choke hold, and pushed his face with her face. She had also previously blocked him from leaving the residence. He testified that she did so again on May 8, 2024.

{¶ 25} Wa-Tenza recorded a portion of the May 8 argument with his camcorder, and approximately nine minutes of that video was played for the jury. The beginning of the video showed Wa-Tenza and J.W. seated side-by-side, arguing over Wa-Tenza's ex-girlfriend, their disregard of each other's feelings, and how they cut each other off while the other was speaking. During his testimony, Wa-Tenza agreed that he did most of the talking. J.W. mostly looked straight ahead when he spoke to her.

{¶ 26} Approximately seven and a half minutes into the recording, J.W. called Wa-Tenza derogatory names. Wa-Tenza responded that he "was out" and stood to put on his pants. J.W. also stood, and each told the other to "shut up." The argument became more heated as they talked over each other. When Wa-Tenza referred to J.W. as a b*tch, J.W. got directly in Wa-Tenza's face and caused him to take a step back. The argument continued

8

as Wa-Tenza put on a sock. The recording ended when J.W. turned and reached for the camcorder, and Wa-Tenza swiped his hand toward hers.

{¶ 27} Wa-Tenza testified that J.W. slapped the camcorder off the couch, breaking it. He said that he had tried to stop her because she had previously broken another expensive camcorder. Wa-Tenza told J.W. that she was going to pay for the camcorder, but J.W. denied breaking it. Because he was angry about the broken camcorder, he grabbed J.W.'s phone from somewhere near the couch. According to Wa-Tenza, "that's when she tackled me into the wall." J.W. also scratched his hand trying to get her phone out of his hand. Wa-Tenza denied punching holes in the living room wall.

{¶ 28} Wa-Tenza further testified that he tried to get away from J.W., but he was not then trying to leave the residence. He stated that J.W. followed him around, trying to "get ahold" of him. Wa-Tenza acknowledged that he had kicked the litter box but denied throwing litter at J.W. Rather, he asserted that J.W. picked up the litter box and threw it at him. He also denied choking J.W. or grabbing her by the neck, and he claimed that K.W. had lied during her testimony. He did not recall if J.W. had tried to choke him.

{¶ 29} Wa-Tenza said that he decided to leave when K.W. came down the stairs, but J.W. was blocking the door. He threw J.W.'s phone down and asked her to get out of his way; however, J.W. did not move. Wa-Tenza testified that he grabbed J.W.'s arms and moved her to the side, then opened the door and left. As soon as Wa-Tenza walked out, J.W. told her daughter to call 911. J.W. followed Wa-Tenza to his car but did not get in. Wa-Tenza denied threatening J.W. before driving away. After he left, he called J.W. to see if she was serious about contacting the police.

{¶ 30} Upon questioning by the State, Wa-Tenza indicated that he knew martial arts and how to defend himself. He further stated that he had trained J.W. how to fight and that

9

she could have hurt him. When asked whether he was fearful, he replied that he "never said [he] was fearful." He later stated, "I wouldn't say that I was fearful for my safety as far as her being able to dominate me. She did scratch me before. I still have the permanent scar. So if you say fearful in a way of being like scratched up or something like that, then yes. Fearful of her beating me up, no." Trial Tr. 171-172. Upon redirect examination, Wa-Tenza said that he had a reasonable belief that J.W. would have physically harmed him if she could, that he feared that she would scratch or tackle him, and that he did not feel he had a method of leaving other than by physically removing her from the doorway.

{¶ 31} Upon his arrest, the Xenia police officers observed that Wa-Tenza had scratches on the middle finger of his right hand, as documented by Officer Farrar. Rothenberger testified that the scratches were consistent with an altercation or punching a wall, but he acknowledged that a person's hands could be scratched in many ways, including by another person.

{¶ 32} With the evidence before us, we cannot conclude that the jury lost its way when it rejected Wa-Tenza's self-defense claim and found him guilty of assault. "Self-defense claims generally involve an evaluation of witness credibility." *Rhoades*, 2025-Ohio-2358, at ¶ 16 (2d Dist.). It was the province of the jury, as the trier of fact, to assess the witnesses' credibility and determine whether the State had proven beyond a reasonable doubt that Wa-Tenza assaulted J.W. In reaching its verdict, the jury was free to believe all, part, or none of the witnesses' testimony. *State v. Peterson*, 2021-Ohio-3947, ¶ 27 (2d Dist.).

{¶ 33} In this case, the State's evidence supported the conclusion that Wa-Tenza did not act in self-defense. Although Wa-Tenza testified that the video of the argument showed that J.W. had pushed his face with her own, the jury could have reasonably found that the physical confrontation did not begin until after his camcorder was knocked to the floor. Under

10

J.W.'s version of events, Wa-Tenza's initiated the physical confrontation after the camcorder was broken. She testified that Wa-Tenza lunged at her and pushed her onto the couch when she reached for the camcorder. He then pushed her to the couch a second time, yanked her to the floor by her feet, and got on top of her. She further described how he grabbed her by the throat and pushed her against shelving as she tried to get him to leave. J.W.'s testimony that Wa-Tenza had choked her was corroborated by K.W.'s testimony, and her injuries were consistent with what she said had occurred.

**{¶ 34}** Wa-Tenza described the altercation differently, asserting that J.W. began the argument and tackled him, that he had a reasonable belief that J.W. would physically harm him, and that he had no means of leaving other than by physically removing J.W. from the doorway. However, the jury was free to believe J.W.'s testimony over Wa-Tenza's, and we cannot conclude that the jury lost its way in doing so. The jury's conclusion that Wa-Tenza had not acted in self-defense was not against the manifest weight of the evidence.

**{¶ 35}** Wa-Tenza's assignment of error is overruled.

### III. Conclusion

**{¶ 36}** The trial court's judgment is affirmed.

. . . . . . . . . . . . .

TUCKER, J., and HUFFMAN, J., concur.

11